```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
                                                                       :
PARAGON DIGITAL LIFESTYLE INC.,                                        :
                                                                       :
                                Plaintiff,                             :
                                                                       :        20-CV-4725 (JMF)
                -v-                                                    :
                                                                       :        OPINION AND ORDER
ADAPTIVE MICRO-WARE, INC.,                                             :
                                                                       :
                                Defendant.                             :
                                                                       :
-----------------------------------------------------------------------X
```

JESSE M. FURMAN, United States District Judge:

Plaintiff Paragon Digital Lifestyle Inc. ("DigiValet") provides products and services to hotels to enable guests to control room amenities and hotel services from a tablet, computer, or smartphone. In 2017, the company entered into an agreement with Defendant Adaptive Micro-Ware, Inc. ("Adaptive") pursuant to which Adaptive was to create a technology solution that would enable DigiValet to program its products to control televisions in North American hotels. In the agreement, Adaptive estimated that the third and critical phase of the project would take only four to five weeks to complete. More than one year later, however, Adaptive still had not delivered. Fed up, DigiValet declared Adaptive to be in breach of the agreement and requested its money back; Adaptive refused. This lawsuit, in which DigiValet brings a claim for breach of contract and a claim for unjust enrichment, followed. Each party now moves, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for summary judgment. For the reasons that follow, the Court grants summary judgment to DigiValet on the contract claim and awards it $272,486 in damages. In light of that conclusion, the Court dismisses the unjust enrichment claim.

**ADAPTIVE'S MOTION PAPERS**

Before turning to the relevant facts, the Court feels compelled to comment on several disheartening aspects of Adaptive's motion papers.  First, Adaptive's initial memorandum of law is noteworthy for its lack of relevant analysis.  Adaptive spends nearly fifteen pages reciting the facts and the applicable legal standards and devotes barely more than three pages to analysis of DigiValet's contract claim, the central issue in dispute.  *See* ECF No. 56 ("Def.'s Mem."), at 15-18.  Second, and even more noteworthy, Adaptive's second memorandum of law — in opposition to DigiValet's cross-motion and in further support of Adaptive's motion — is virtually identical to its initial memorandum of law, literally repeating whole swathes of the initial memorandum verbatim and failing to respond to many of DigiValet's arguments.  *See* ECF No. 68 ("Def.'s Reply).  Third, Adaptive includes its "Statement" and "Counterstatement" of undisputed facts in its memoranda of law, *see* Defs.' Mem. 9-14; Defs.' Reply 15-23, in violation of the Local Civil Rules, which require "*a separate*, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried."  Local Civil Rule 56.1(a) (emphasis added).

But worst of all, in its memoranda and Local Rule 56.1 "Statements," Adaptive cites to entire exhibits, many of which are hundreds of pages long, instead of citing with particularity to evidence that supports its arguments.  To give but one example: Adaptive's "Exhibit E" — to which it cites repeatedly in its papers — includes nearly six-hundred pages of emails that were sent over a span of years.  ECF Nos. 56-5 to 56-8.  Making matters (even) worse, Adaptive filed these hundreds of pages of emails as an attachment to its motion without any kind of affirmation or authentication as to their accuracy.  *See e.g.*, *Elghourab v. Vista JFK, LLC*, No. 17-CV-911 (ARR)(ST), 2018 WL 6182491, at *2 (E.D.N.Y. Nov. 27, 2018) ("In order for documentary

evidence such as emails to be admissible, the evidence must first be authenticated, i.e., the party offering the evidence must provide a rational basis for concluding that an exhibit is what it is claimed to be." (internal quotation marks omitted)); *see also* ECF No. 63-39 ("Pl.'s Mem."), at 17 & n.7.

Admissibility aside, this does not comport with Rule 56 of the Federal Rules of Civil Procedure and Local Civil Rule 56.1, which require a party moving for or opposing summary judgment to cite to "*particular parts* of materials in the record." Fed. R. Civ. P. 56(c)(1)(A) (emphasis added). Indeed, "in order to survive [or prevail on] a motion for summary judgment, [a party's] counsel must *specifically* identify relevant facts and explain why those facts justify denying [or granting] the summary judgment motion." *Collins v. City of New York*, No. 14-CV-8815 (AJN), 2017 WL 11582468, at *2 (S.D.N.Y. July 10, 2017) (Nathan, J.) (emphasis added). Or as the Sixth Circuit has put it: "Nothing in either the Rules or case law supports an argument that the trial court must conduct its own probing investigation of the record. . . . What concept of judicial economy is served when judges . . . are required to do the work of a party's attorney?" *Guarino v. Brookfield Twp. Trs.*, 980 F.2d 399, 405-06 (6th Cir. 1992); *see also, e.g.*, *In re Agent Orange Product Liability Litig.*, 517 F.3d 76, 91 n.14 (2d Cir. 2008) ("Fed. R. Civ. P. 56 does not impose an obligation on the court considering a motion for summary judgment to perform an independent review of the record to find proof of a factual dispute." (cleaned up) (citation omitted); *Amnesty Am. v. Town of W. Hartford*, 288 F.3d 467, 470 (2d Cir. 2002) (Sotomayor, J.) ("[N]othing in the federal rules mandates that district courts conduct an exhaustive search of the entire record before ruling on a motion for summary judgment").

The Court is tempted to deny Adaptive's motion and grant DigiValet's cross-motion on the basis of these deficiencies alone. At a minimum, the Court would be on firm ground

deeming the facts set forth in DigiValet's (procedurally proper) Local Rule 56.1 Statement to be admitted.  *See* Local Civil Rule 56.1(c) ("Each numbered paragraph in the statement of material facts . . . will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party."); *see, e.g.*, *Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party . . . fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted."); *Emanuel v. Griffin*, No. 13-CV-1806 (JMF), 2015 WL 1379007, at *2 (S.D.N.Y. Mar. 25, 2015) (deeming admitted "those portions of Defendants' Rule 56.1 statements to which Plaintiffs fail to respond or for which Plaintiffs fail to include a reference to competent evidence").  But the Court need not take either of these paths for the simple reason that the evidence — most of which is documentary and, therefore, undisputed — supports the same results.[1]  Accordingly, the Court now turns to that evidence.

## BACKGROUND

The following facts are drawn from the admissible materials submitted by the parties in connection with these motions and are either undisputed or described in the light most favorable to Adaptive.  *See Costello v. City of Burlington*, 632 F.3d 41, 45 (2d Cir. 2011).

DigiValet is a company that provides products and services to hotels to enable guests to control room amenities and hotel services from a tablet, computer, or smartphone.  *See* Pl.'s

---

[1] Indeed, it is hard to avoid the conclusion that Adaptive's failure to cite to specific parts of the record was intended to obscure the absence of evidence to support its claims.  For example, citing Exhibit C, a 92-page deposition transcript, and Exhibit D, a 282-page deposition transcript, Adaptive asserts that it "was clear with [DigiValet] that there was no guaranty that the module they sought was capable of production or that even if capable of production, that it would be viable."  Def.'s Mem. 15.  But the exhibits reveal no such thing.  In addition, citing Exhibit E, the nearly 600-page batch of emails, Adaptive asserts that, "[i]n certain instances, months would pass between [Adaptive's] requests for feedback and assistance and [DigiValet's] response, causing delays in the process."  *Id.* at 16.  But, as discussed in detail below, that is inaccurate.

Mem. 3.  In 2017, DigiValet was preparing, for the first time, to supply a North American hotel with a tablet solution that would include control of the in-room television set, but it discovered that it would need to use different technology to decrypt the television streams than it had used in other parts of the world.  ECF No. 63-1 ("Salgia Decl."), ¶¶ 4-5.  About 95% of the North American market encrypts television signals using a technology called Pro:Idiom that was developed by Zenith Electronics.  *Id.* ¶ 4.  DigiValet hired Adaptive to create a decryption solution, in no small part because Adaptive touted its experience working with Zenith's systems.  *Id.* ¶ 7; *see also* ECF No. 63-3, at 2 (Adaptive's webpage stating that "Adaptive is an experienced implementation partner for Zenith's Pro:Idiom Digital Rights Management system").

On September 5, 2017, the parties signed a contract titled "Engineering Agreement for DigiValet."  ECF No. 63-4 (the "Agreement").[2]  The Agreement — which was drafted by Adaptive — specified the requirements of Phase I of the project, during which Adaptive was to create a "Detailed Specification document," namely an engineering blueprint for the project.  *Id.* at 2.  Significantly, the Agreement acknowledged that "[t]his project has an urgent time to market requirement" and promised that "Adaptive will provide its services . . . to ensure its most flexible scheduling and availability to support this urgency."  *Id.*  More specifically, Adaptive provided an estimate that "the completion of the Detailed Specification is expected to take approximately three to five weeks to complete."  *Id.*

As required by the Agreement, DigiValet paid Adaptive an initial deposit of $25,000 on September 5, 2017.  Salgia Decl. ¶ 13; *see* ECF No. 63-5.  On that same day, Adaptive emailed

---

[2] Citations to page numbers in ECF Nos. 63-3 to 63-34 are to the page numbers automatically generated by the Court's Electronic Case Filing system.

DigiValet requesting a copy of DigiValet's licensing agreement with Zenith, which DigiValet sent the very next day. Salgia Decl. ¶¶ 14-15; *see* ECF Nos. 63-6, at 2, 63-7. Nevertheless, and despite its initial estimate of only three to five weeks, Adaptive did not produce the Detailed Specification Document until February 20, 2018 — *more than six months later*. Salgia Decl. ¶¶ 16-17; *see* ECF No. 63-9. In its email providing the blueprint, Adaptive advised that the diagram and parts list were "suitable for use with your hardware designer" and explained that it would "next provide the system and software . . . and will also follow up as [DigiValet] requested with [its] estimates to support the creation of the FPGA firmware, as well as . . . to help power up and test the initial prototype." ECF No. 63-9, at 2. Relying on Adaptive's Detailed Specification Document, DigiValet hired a third party to manufacture a printed circuit board ("PCB"), at a cost of $28,000. Salgia Decl. ¶ 18; *see* ECF No. 63-10 (invoices for the PCBs).

The Agreement included a provision that, "[u]pon completion of the Phase I Detailed Specification, at Customer's option, Adaptive . . . will be prepared to provide a project estimate and quotation for the services needed to design and develop the specified circuit board and/or pluggable external module and firmware required to accommodate Customer requirements." Agreement 2. In accordance with that provision, the parties signed "Attachment A," an extension of the Agreement, on May 8, 2018. *See* Agreement 4-5. This first extension, referred to as Phase II, required Adaptive to develop firmware that would provide control of the circuits on the PCB, load the firmware onto the prototype PCB, and test it to make sure the PCB properly functioned. *Id.*; *see also* ECF No. 63-11 (emails confirming the parties' understanding of the scope of Attachment A). Adaptive estimated Phase II would take four to six weeks to complete. Agreement 4. On May 18, 2018, DigiValet paid an additional deposit of $15,000. Salgia Decl. ¶

6

22. On June 29, 2018, DigiValet provided Adaptive with a prototype board. Salgia Decl. ¶ 25; *see* ECF No. 63-13, at 3. On July 12, 2018, DigiValet paid the first progress payment for Phase II of $15,000. Salgia Decl. ¶ 26. On July 31, 2018, Adaptive confirmed that "[a]lthough the testing time was stretched out due to a number of time consuming issues, . . . on the whole the board appears usable for further integration and testing with the Host Linux board." ECF No. 63-15, at 2. Based on this confirmation, DigiValet ordered four hundred PCBs from the third-party manufacturer for a total of $144,486. Salgia Decl. ¶ 30; ECF No. 63-10. On August 16, 2018, DigiValet paid the second and final progress payment of $15,000 for Phase II. Salgia Decl. ¶ 29.

Then, on September 14, 2018, the parties executed Attachment B, a second extension of the Agreement, which required Adaptive to "develop, test and integrate the operational . . . firmware . . . with the Customer current versions of the Set Top Reference Boards." Agreement 6-7. Importantly, Adaptive estimated that this part of the project, known as Phase III, would take four to five weeks and reiterated its commitment to "work[ing] closely with [DigiValet's] team to help get [its] product quickly to market." ECF No. 63-19, at 2. On September 17, 2018, DigiValet made the initial payment of $20,000 for Phase III. Salgia Decl. ¶ 36; *see* ECF No. 63-20. On September 27, 2018, Nitin Agrawal, a DigiValet employee, stated that the set top board was "in the final stage of production" and that it would "be able to ship the same to you soon." ECF No. 63-22, at 2. Adaptive does not appear to have responded. On October 5, 2018, Rahul Salgia, DigiValet's CEO, requested "an update on this project" and stated that he was "a bit concerned about the delay in completion of this project" because DigiValet "for sure need[ed] to start producing the modules in the first week of November due to a project deadline that [it had] to meet." *Id.* On November 8, 2018, Thomas DiPuma of Adaptive acknowledged that

7

"DigiValet is now in a time critical position with its first production run." *Id.* at 5. Twelve days later, DigiValet made a second payment for Phase III of $10,000. Salgai Decl. ¶ 40.

Nevertheless, the delays continued. On December 7, 2018, Bob Kniskern of Adaptive stated that they had "not yet shipped the test module and our working Python demonstration" but that it would likely ship the following Monday. ECF No. 63-22, at 14. The next day, Salgia responded that he had been "expecting the final firmware on this Thursday" and emphasized that "we have 1000 units . . . in the factory and we are waiting for the TV module to be installed and sent to the customer" and that "[t]he TV modules are all ready," except for the firmware. *Id.* Once again, Salgia emphasized the time sensitivity, stating that DigiValet "need[ed] to have the goods delivered in Boston by 20th Jan otherwise we will have to pay [a late delivery] charge of $25,000 per week." *Id.* Two days later, on December 10, 2018, Salgia stated that he was "concerned about the time it is taking to get the final firmware" and that he was "holding the factory and more importantly the shipment," waiting for "the final firmware which we can load into the modules" so that they could "ship them to the customer." *Id.* at 17. Later that day, Salgia told Kniskern that "I just want you to know once again . . . the time pressure I am facing" and asked him to "[please] help us with the final firmware. The entire production line is waiting for this as we have no way to upload the firmware in the field." *Id.* at 21.

This pattern continued in early January 2019, with DigiValet sending messages expressing its concern about the timeline and Adaptive unable to provide much of an update. For example, on January 8, 2019, Adaptive reported that the "build . . . was not yet operational enough to send." *Id.* at 29. On January 15, 2019, Agrawal sent Adaptive a message acknowledging that Kniskern had been "working extended hours and very hard to deliver 100 percent tested firmware," but informing him that "we have no choice but to ship the controller

8

this Friday from Taiwan," meaning that Adaptive would have to send DigiValet the firmware by the end of the day. *Id.* at 23. Given the delays up to that point, Agrawal asked again if Kniskern could "please share the final firmware to achieve the above which itself looks near impossible but we will have to manage this to avoid lo[]sing the project." *Id.* The next day, Kniskern responded that the firmware was not "usable" but that they were "launching another build/simulation." *Id.* at 33. Agrawal responded: "Only one question . . . when can we expect the final build?" *Id.* (emphasis omitted). On January 17, 2019, Kniskern dodged the question, explaining that they were "continuing [their] efforts to resolve" the issues identified and believed they were "close to resolution," but that he could not "be confident to project a final timeframe right now." *Id.* at 32. He suggested that if DigiValet had to ship the units "due to manufacturing timelines, there perhaps could be a later 'one time' reprogramming of each unit before final installation at your customer." *Id.* On January 18, 2019, Agrawal told Kniskern that they "had to ship the controllers (400 units) without software because of our commitment to the client. Rest of the units must have firmware installed for which we would need the firmware from your end." *Id.*

Through late January and early February, Kniskern continued to provide updates, indicating that "progress is slow [but] its [sic] been more steady lately," *id.* at 71, as Agrawal and Salgia begged for a firm timeline, explaining that they had a presentation for their client coming up. As the presentation loomed, the parties emailed multiple times a day, with Kniskern repeatedly agreeing to, and then not fulfilling, deadlines. *See, e.g.*, *id.* at 60-71. Finally, on February 13, 2019, Agrawal emailed Kniskern: "Am in-front of the client and have no answer to them for the demo and further timelines. I can not [sic] tell you how embarrassing this is . . . ." *Id.* at 59. Thereafter, the emails continued along the same lines, with DigiValet getting increasingly frustrated with Adaptive. On February 19, 2019, for example, Agrawal asked

9

Kniskern to "[p]lease be honest in sharing final date rather than saying [a] few hours." *Id.* at 76. On February 25, 2019, Kniskern sent an update: "We regret that we have not been able to better estimate to this point, we have not yet achieved a stable integrated release yet." *Id.* at 72.

On April 2, 2019, Adaptive mentioned — for the first time — that there might be an issue with the Zenith Pro:Idiom chip. *See* Salgia Decl. ¶ 49; ECF No. 63-26, at 2. Agrawal responded the very next day and, on April 18, 2019, connected Adaptive and Zenith directly to see if they could resolve the outstanding issues. ECF No. 63-27, at 2; ECF No. 63-29; Salgia Decl. ¶ 51. Agrawal explained to the Zenith representative, Richard Lewis, that DigiValet had "engaged a company named Adaptive Microware in USA" to help create "a board with Pro:Idiom Decryption capabilities" and requested Lewis's help with "some technical issues." ECF No. 63-29, at 6. On May 8, 2019, after several messages back and forth, Tom DiPuma of Adaptive told Salgia that Zenith's "[l]atest response to our questions was helpful" and that they would "continu[e] testing and will update you as we proceed." *Id.* at 3. On May 13, 2019, Salgia prompted Adaptive: "Its [sic] been about 4 weeks since the last response from [Zenith]. Pl[ease] let us know what[']s the status and when do we get the final working product." *Id.* On May 18, 2019, Salgia reiterated the urgent timeframe because "[t]he hotel for which this is required is opening in 3 weeks." ECF No. 63-30, at 6. Six days later, Kniskern responded that they had not solved the issue and offered that, "[i]f it would help move the support along . . . we could travel to the [Zenith] lab in Chicago to work with the[ir] support people one-on-one." *Id.* at 5. Salgia agreed and directed Kniskern to plan the meeting with Zenith as soon as possible. *Id.* On June 12, 2019, Agrawal reiterated that DigiValet "d[id] not have any issue in your direct communication with [Zenith] as long as we have a working solution. You may [] send the draft just for our understanding but [] please proceed to send the details to [Zenith] as you are the

expert in the subject matter." *Id.* at 2.  Yet, as of July 11, 2019, one month later, Adaptive still had not contacted Zenith.  On that date, Kniskern noted that his team was still "preparing our detailed submission to [Zenith] for their comment, expect to send that out Thursday afternoon." ECF No. 63-31, at 8.

The email exchanges continued throughout July 2019.  On August 13, 2019, nearing the end of his rope, Salgia wrote to Kniskern: "I don't know if you are testing our patience or waiting [for] us to get tired and stop following up on this project.  If you think this is not happening and you want to focus on more productive jobs for you then [please] say so."  ECF No. 63-32, at 4.  He continued: "It is not right for you to keep us waiting forever . . . .  I have told you we have an important project and the way things are coming from your side it is quite evident that it is not going to m[e]et the timeline for the second time."  *Id.*  Faced with more excuses, on August 29, 2019, Salgia suggested that Adaptive "refund the money [DigiValet had] paid towards the project as this has not been successful."  *Id.*  Kniskern sent a few more purported updates, but Adaptive did not seem to be making progress.  *See id.* at 2-4.  On September 5, 2019, Agrawal explained that DigiValet was "expecting a working product after all the efforts in [the] last one year," but instead had received "only some words of updates" and asked: "Are you really serious in delivering the product?"  ECF No. 63-33, at 3.  On September 6, 2019, Kniskern insisted that he was, *id.* at 2, but on September 18, 2019, Salgia finally pulled the plug.  On that date, he wrote: "Can I request you to just stop this and return our money since the project has not been successfully delivered.  I know you have other tasks and it is better you focus your time on jobs that are more productive for you.  It is unfortunate that this project was not successful for you."  *Id.*  Adaptive never responded.  Salgia Decl. ¶¶ 59, 61.

11

DigiValet had to move quickly to develop an alternative to its plan with Adaptive and was able to produce a software-based solution for the hotel customer it most immediately needed to serve. Salgia Decl. ¶¶ 66, 68. DigiValet claims that the software solution will not work across the board in North America and is therefore not a true substitute for the hardware solution that Adaptive was building for it. *Id.* ¶ 68. On December 30, 2019, DigiValet's Chief Legal Officer sent a demand letter to Adaptive, requesting a refund of the $100,000 DigiValet paid pursuant to the Agreement; $172,486 it paid to obtain the PCBs in accordance with Adaptive's design; $70,000 for the alternative solution DigiValet implemented; and $50,000 due to damage to DigiValet's reputation and business. *See* ECF No. 63-34, at 6; *see also* ECF No. 63-10. Adaptive did not respond. *Salgia* Decl. ¶¶ 59, 61. This lawsuit followed. *See* ECF No. 1.

## SUMMARY JUDGMENT STANDARDS

Summary judgment is appropriate when the admissible evidence and pleadings demonstrate "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012). A dispute over an issue of material fact qualifies as genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *accord Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008). In ruling on a motion for summary judgment, a court must view all evidence "in the light most favorable to the non-moving party," *Overton v. N.Y. State Div. of Mil. & Naval Affs.*, 373 F.3d 83, 89 (2d Cir. 2004), and must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought," *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line Inc.*, 391 F.3d 77, 83 (2d Cir. 2004).

Where, as here, both sides move for summary judgment, "neither side is barred from asserting that there are issues of fact, sufficient to prevent the entry of judgment, as a matter of law, against it." *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993). "[T]he court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Id.* (quoting *Schwabenbauer v. Bd. of Educ.*, 667 F.2d 305, 314 (2d Cir. 1981)). To defeat a motion for summary judgment, the non-moving party must advance more than a "scintilla of evidence," *Anderson*, 477 U.S. at 252, and demonstrate more than "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The non-moving party "cannot defeat the motion by relying on the allegations in [its] pleadings, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. County of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (citation omitted). Moreover, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## DISCUSSION

To prevail on a breach-of-contract claim under New York law, a plaintiff must prove four elements: "(1) the existence of a contract, (2) performance by the party seeking recovery, (3) nonperformance by the other party, and (4) damages attributable to the breach." *Moreno-Godoy v. Kartagener*, 7 F.4th 78, 85 (2d Cir. 2021) (internal quotation marks omitted).[3] Here,

---

[3] The Agreement does not specify what law applies, but the parties rely on New York law, *see* Def.'s Mem. 6-8; Pl.'s Mem. 13, 19, 23-28, so the Court will as well, *see Alphonse Hotel*

there is no dispute that Adaptive and DigiValet entered into a valid and unambiguous contract. *See* Def.'s Mem. 18 ("There is no assertion by the Plaintiff that the Engineering Agreements are not valid or that they do not cover the scope of the dispute between the parties"); Pl.'s Mem. 14 ("Defendant agrees that the parties entered into a valid contractual relationship and that there is no contractual ambiguity in the governing documents."). Nor does Adaptive contend that DigiValet breached the contract in any way. *See* Pl.'s Mem. 14; *see also, e.g.*, ECF No. 56-4 ("Kniskern Tr."), at 44 (noting that DigiValet "w[as] always very timely with their payments"). Thus, the only open questions are whether Adaptive breached the Agreement through its delays and ultimate failure to deliver a finished product and, if so, what damages to award.

The Court will address each of these questions in turn.

**A. Breach**

First, the Court holds that Adaptive breached the Agreement by failing to perform, let alone within a reasonable time. "Where a contract does not specify a date or time for performance, New York law implies a reasonable time period." *Guilbert v. Gardner*, 480 F.3d 140, 149 (2d Cir. 2007). "'In determining what constitutes a reasonable time for performance, courts consider the following factors: the facts and circumstances of the particular case, including the subject matter of the contract; what the parties contemplated at the time of contract; and the circumstances surrounding performance." *RCN Telecom Servs., Inc. v. 202 Ctr. St. Realty LLC.*, 156 F. App'x 349, 351 (2d Cir. 2005) (summary order). Significantly, although an "estimated" delivery date certainly provides "some latitude beyond literally the date," the word "'estimated' does not mean 'whenever we feel like it' or 'there's no deadline whatsoever.'"

---

*Corp. v. Tran*, 828 F.3d 146, 152 (2d Cir. 2016) ("The parties' briefs assume that New York law controls, and such implied consent is sufficient to establish choice of law." (cleaned up)).

14

*Intelligen Power Sys., LLC v. dVentus Techs. LLC*, No. 14-CV-7392 (PAE), 2015 WL 3490256, at *5 (S.D.N.Y. June 2, 2015); *see, e.g.*, *A. Leo Nash Steel Corp. v. C.D. Perry & Sons, Inc.*, 491 F.2d 948, 950 (2d Cir. 1974) (holding that where a written contract provided for "delivery in early spring," a valid delivery could "not have been fulfilled by delivery in August"). Moreover, the presence of a specific estimate in a contract is strong evidence of "what the parties contemplated at the time of contract." *RCN Telecom Servs.*, 156 F. App'x at 351.

Here, of course, Adaptive did not perform its obligations at all. That is, the company *never* delivered on the promises it made in Attachment B of the Agreement. Thus, it cannot be disputed that it breached the Agreement. *See, e.g.*, *CareandWear II, Inc. v. Nexcha L.L.C.*, 581 F. Supp. 3d 553, 557-58 (S.D.N.Y. 2022) (granting summary judgment on breach of contract claims where the defendant "never delivered" the products that the plaintiff paid for); *Dorchester Pub. Co. v. Lanier*, No. 01-CV-8792 (DAB), 2006 WL 4388035, at *6 (S.D.N.Y. Mar. 19, 2006) (where the defendant does not dispute that it "never delivered any of the three" books that it promised, breach of contract was established). But even if the question were analyzed as one of delay alone (which is how the parties treat it), the Court would reach the same conclusion. For Phase I, Adaptive estimated that it would perform in three to five weeks, but it took six months. For Phase II, Adaptive estimated four to six weeks but took 11 weeks. And, most significantly, for Phase III, Adaptive estimated four to five weeks but still had not delivered a working product a year later. That is, Adaptive failed to deliver on its obligations under Phase III *within ten times the period it had estimated*. No reasonable jury could find that that extraordinary delay is anything other than a breach of the contractual obligation to perform within a reasonable time. *See, e.g.*, *Intelligen Power Sys.*, 2015 WL 3490256, at *5-6 (finding a complaint adequately

15

alleged breach of contract where the defendant estimated that its performance would take sixteen weeks, and it had not performed within fifty-five weeks).

Adaptive's excuses do not withstand scrutiny. First, Adaptive asserts that DigiValet "did not provide the Defendant with any details relative to any time-sensitivity of the work performed by Defendant except to note that the Plaintiff wanted it done as quickly as possible so that they could take the newly developed product to market." Def.'s Mem. 2, 16. That argument is both irrelevant and wrong. As discussed above, DigiValet repeatedly emphasized the time constraints of the project as well as the specific deadlines by which it needed a working product and Adaptive's employees were well aware of the relevant deadlines. *See, e.g.*, Kniskern Tr. 250 (Q: "Were you aware that they were urgently trying to complete this project to implement into a hotel client of theirs?" A: "Different times during the project they would discuss different, you know, different customers, installations they were working on — so certainly I knew they were intending and wishing to deploy the system in America.").[4] Adaptive also argues that the failure of the project was "principally driven by the Plaintiff's unwillingness to contact Zenith . . . to attempt to resolve the open functionality issues" and that it "suggested on many occasions that the Plaintiff permit them to contact Zenith . . . and the Plaintiff refused that option." Def.'s Mem. 2-3. To the contrary, the undisputed evidence shows that as soon as Adaptive suggested that there may have been a problem with the Zenith technology, DigiValet repeatedly urged Adaptive to work with Zenith. *See, e.g.*, ECF No. 63-30 ("We do not have any issue in your direct communication with [Zenith] as long as we have a working solution. You may [] send the

---

[4] Adaptive's argument that DigiValet's expectation that "the Project cost would be recouped over a three-to-four-year period" meant that the project was not time sensitive, *see* Def.'s Mem. 2, is specious. That it may take a while for a company to recoup an investment in new technology does not mean that it has no interest in bringing a project to market quickly.

16

draft just for our understanding but [] please proceed to send the details to [Zenith] as you are the expert in the subject matter."); *see also* Pl.'s Mem. 22.  Accordingly, the Court finds that Adaptive breached the contract by failing to perform within a reasonable time.

**B. Damages**

That leaves the question of damages.  In particular, DigiValet seeks of (1) a refund of the $100,000 that it paid Adaptive pursuant to the Agreement; (2) reimbursement of the $172,486 it paid to the third-party manufacturer to produce the PCBs in reliance on Adaptive's Detailed Specification Document; and (3) reimbursement of the $81,443 it spent in mitigation costs on an alternative solution when Adaptive failed to deliver.  Pl.'s Mem. 24.[5]

It is well established that the primary purpose of damages for breach of contract is to make the plaintiff "whole."  *Moreno-Godoy v. Kartagener*, 7 F.4th 78, 86 (2d Cir. 2021).  This is typically accomplished by awarding "expectation" damages, also known as "benefit-of-the-bargain" damages, that put the plaintiff in as good an economic position as if the defendant had fully performed under the contract.  *Bausch & Lomb Inc. v. Bressler*, 977 F.2d 720, 728-29 (2d Cir. 1992); *see also McKinley Allsopp, Inc. v. Jetborne Int'l, Inc.*, No. 89-CV-1489 (PNL), 1990 WL 138959, at *8 (S.D.N.Y. Sept. 19, 1990) (Leval, J.) ("Under New York law, the normal measure of damages for breach of contract is expectation damages.").  But where the plaintiff's expectancy interest is not reasonably certain or cannot be measured without speculation, a plaintiff may recover other forms of compensatory damages.  *See, e.g.*, *Young v. Rosenberg*, No. 14-CV-9377 (WHP), 2017 WL 3267769, at *1 (S.D.N.Y. Aug. 1, 2017).  "[A]s an alternative to

---

[5] In a footnote in its memorandum of law, DigiValet notes that, "[i]f this action proceeds to trial," it would seek to recover for "damages to its reputation."  Pl.'s Mem. 25 n.12.  That reservation, however, cannot be squared with the fact that DigiValet seeks entry of summary judgment in its favor.  Accordingly, the Court deems DigiValet to have forfeited any claim to damages for harm to its reputation.

expectation-based damages (which would include lost profits and benefit of [the] bargain)," for example, "a plaintiff may recover damages based on his reliance interest, including expenditures made in preparation for performance or in performance." *St. Lawrence Factory Stores v. Ogdensburg Bridge & Port Auth.*, 13 N.Y.3d 204, 208 (2009) (internal quotation marks omitted); *accord World of Boxing, LLC v. King*, 634 F. App'x 1, 3 (2d Cir. 2015) (summary order). So too, a plaintiff may seek restitution damages, which "enable the innocent party to recover any benefit conferred by it upon the breaching party as a result of the existence of the contract between them." *McKinley Allsopp*, 1990 WL 138959, at *8; *see also Young*, 2017 WL 3267769, at *2 ("The fundamental purpose of restitution is to prevent unjust enrichment." (internal quotation marks omitted)). Importantly, "[t]he purpose of both restitution and reliance damages is, unlike expectation damages, to return the innocent party to the economic position it occupied before the contract was entered." *McKinley Allsopp*, 1990 WL 138959, at *8; *see also Syncora Guarantee Inc. v. Countrywide Home Loans, Inc.*, 935 N.Y.S.2d 858, 869 (Sup. Ct. 2012) ("Compensatory damages are intended to make the victim of wrongdoing whole. The damages are to place the wronged victim in the same position as it was prior to the wrongdoing, without providing the recovery of any windfall."); Restatements (Second) of Contracts § 349.

      Here, DigiValet does not, and likely cannot, establish expectation damages because the profits it could have made upon implementation of its new technology in a new market are simply too speculative. *See, e.g.*, *Holland Loader Co. LLC v. FLSmidth A/S*, 769 F. App'x 40, 43 (2d Cir. 2019) (summary order) (noting that "evidence of lost profits from a new business venture receives greater scrutiny because there is no track record upon which to base an estimate"); *InspiRx, Inc. v. Lupin Atlantis Holdings SA*, 554 F. Supp. 3d 542, 563-64 (S.D.N.Y. 2021). But it is plainly entitled to the first two categories of damages it seeks — namely, the

$100,000 it paid Adaptive and the $172,486 it paid to the third-party manufacturer in reliance on Adaptive's performance — as restitution and reliance damages.[6]  By contrast, the Court concludes that DigiValet is not entitled to reimbursement of the $81,443 that it spent on an alternative solution for its hotel client.  If DigiValet had never entered into the Agreement with Adaptive, it would have had to come up with some solution for its client, which presumably paid DigiValet for its services.  Thus, it would be a windfall to grant DigiValet both a full refund of the money it paid for the failed technology and reimbursement for the working technology the third-party developed.  *See, e.g.*, *Nature's Plus Nordic A/S v. Nat. Organics, Inc.*, 98 F. Supp. 3d 600, 605 (E.D.N.Y. 2015) ("[R]eliance damages are about restoration and strive to place injured parties in the same position as they were prior to the execution of the contract, not to bestow a 'windfall' on injured parties" (cleaned up)), *aff'd,* 646 F. App'x 25 (2d Cir. 2016); *Summit Props. Int'l, LLC v. Ladies Pro. Golf Ass'n*, No. 07-CV-10407 (LBS), 2010 WL 4983179, at *6 (S.D.N.Y. Dec. 6, 2010) ("[R]eliance damages are available only for efforts 'rendered useless' as a consequence of the breach.").  Accordingly, DigiValet is awarded a total of $272,486 in damages.

## CONCLUSION

For the reasons stated above, Adaptive's motion for summary judgment on the breach of contract claim is DENIED and DigiValet's cross-motion on that claim is GRANTED.  As DigiValet effectively concedes, that means that its alternative claim for unjust enrichment, *see* ECF No. 1, ¶¶ 39-45, must be and is dismissed, *see, e.g.*, *Mindspirit, LLC v. Evalueserve Ltd.*, 346 F. Supp. 3d 552, 594 (S.D.N.Y. 2018) ("If at summary judgment the court concludes that the

---

[6]     Adaptive cannot argue that it did not reasonably foresee that DigiValet would order the PCBs as it told DigiValet the diagram and parts list it provided with the Detailed Specification Document were "suitable for use with your hardware designer."  ECF No. 63-9, at 2.

contract at issue is valid and enforceable, then defendants are entitled to summary judgment on the unjust enrichment claim." (internal quotation marks omitted)); *see also Fed. Deposit Ins. Corp. v. Murex LLC*, 500 F. Supp. 3d 76, 120-21 (S.D.N.Y. 2020) (citing cases).

The Clerk of Court is directed to terminate ECF Nos. 55, 63; to enter judgment in DigiValet's favor on Count One in the amount of $272,486 and in Adaptive's favor on Count Two; and to close this case.

SO ORDERED.

Dated: September 22, 2022
      New York, New York

                                            JESSE M. FURMAN
                                            United States District Judge